ADAMS KREK LLP
A Limited Liability Law Partnership

CHRISTIAN K. ADAMS          8192
NENAD KREK                  3705
900 Fort Street Mall, Suite 1700
Honolulu, HI 96813
Tel No. 808.777.2900
Fax No. 808.664.8647
cadams@adamskrekllp.com
nkrek@adamskrekllp.com

Attorneys for Plaintiff
MOLOKAI NEW ENERGY PARTNERS, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MOLOKAI NEW ENERGY PARTNERS, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> MAUI ELECTRIC COMPANY, LIMITED; JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10; and DOE ENTITIES 1-10, <br><br> Defendants. | CIVIL NO.: CV 20-00134 <br><br> **FIRST AMENDED COMPLAINT** |

## **FIRST AMENDED COMPLAINT**

Plaintiff Molokai New Energy Partners, LLC (**"Plaintiff"**) alleges as

follows against Defendant Maui Electric Company, Limited (**"Defendant"**):

1.     Plaintiff is a limited liability company organized and existing under the laws of the State of Hawaii, with its principal place of business in Seattle, Washington.

2.     Plaintiff is 100% owned by Half Moon Ventures, LLC ("HMV"), a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Seattle, Washington.

3.     HMV is 80% owned by CWP USA Inc., a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Seattle, Washington.

4.     HMV is 20% owned by Half Moon Power LLC ("HMP"), a limited liability company organized and existing under the laws of the State of Wisconsin, with its principal place of business in the State of Wisconsin.

5.     HMP is owned by a number of individuals and entities, each of whom is a citizen of a State other than Hawaii or an alien, and none of whom either reside or have their principal place of business in the State of Hawaii.

6.     Defendant is a corporation organized and existing under the laws of State of Hawaii, with its principal place of business in Honolulu, Hawaii.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(1) in that Plaintiff and Defendant are citizens of different

States, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.      Venue is proper in this District under 28 U.S.C. Section 1391(b)(1) & (2).

9.      Defendant is a regulated electric public utility in the State of Hawaii.

10.     Plaintiff is engaged in the business of renewable energy, and specifically conversion of solar energy into electricity.

11.     Plaintiff is building a 4.88-megawatt ("MW") photovoltaic ("PV") project, coupled with a 3 MW/15MWh battery energy storage system ("BESS") with a maximum allowed export of 2.64 MW, in Kaunakakai, on the Island of Molokai (the "Project").

12.     On or about January 24, 2018, in connection with the Project, the parties executed a Power Purchase Agreement For Renewable As-Available Energy And Electrical Services ("PPA").

13.     The PPA was subsequently submitted for approval to, and approved by, the Public Utilities Commission of the State of Hawaii.

14.     The PPA defines the terms and conditions under which Defendant will buy from Plaintiff electricity generated by the Project, and various rights and obligations of each party related to the Project.

15.     Among other things, the PPA defines certain technical requirements which the Project must meet in order for it to be connected to Defendant's electrical grid.

16.     Among other things, the PPA defines certain milestones which the Project must reach by specific dates, failing which Plaintiff may become liable for liquidated damages to be calculated under formulas set forth in the PPA.

17.     The PPA also provides for grace periods which extend the time for the Project to meet the defined milestones under various circumstances, including if Defendant fails to timely perform its own obligations under the PPA.

18.     In the course of 2018, Plaintiff's main equipment vendor for the Project demonstrated that it was unable to meet the requirements of the Project, and Plaintiff had to obtain critical equipment, previously sourced from this vendor, from another source.

19.     Plaintiff eventually determined that it could source equipment from a new vendor, Tesla, that was equal to or better than the original vendor's equipment.

20.     On or about November 19, 2018, Plaintiff submitted a formal request to Defendant for the equipment change for the Project.

21.     At that time, there was no reason why the Project could not have been completed timely within the PPA deadlines.

22.     Timely reaching the guaranteed commercial operation date ("GCOD") in the PPA is critical to Plaintiff because if that milestone is missed by180 days, the PPA gives Defendant the right to terminate the PPA.  In turn, Plaintiff's lenders are unwilling to risk a situation where the Project is terminated shortly before completion of the Project and after the equipment has been purchased and installed, and would not provide continuing funding for the Project under such circumstances.

23.     Despite the requirement in the PPA to act reasonably timely, Defendant unjustifiably delayed meaningful and timely action on Plaintiff's request for its equipment change.

24.     Defendant conducted an Interconnection Requirements Study (the "First IRS") before the execution of the PPA to assure itself that Plaintiff's equipment could be safely attached to Defendant's grid, and in August 2018 it was agreed that a supplemental IRS would be conducted and completed by May 2019.

25.     While Defendant agreed, in principle, on November 30, 2018, with the substitution of Tesla equipment for the equipment of the original equipment vendor, Defendant kept insisting on performing another IRS, stating on December 14, 2018 that it would take six months, while acknowledging that it could be done in 3 to 4 months, and then on January 2019, that it would take up to one year.  Defendant has consistently misrepresented how long it would take to finish the IRS.

26.     While Plaintiff had offered to pay for and conduct the IRS, Defendant advised that it would have its own consultant conduct the IRS.  Despite having agreed to move on with the IRS in early December 2018, Defendant only scheduled the first discussion with Plaintiff about the IRS and preliminary to any substantive work on the IRS on or about March 3, 2019.

27.     Despite having agreed to move on with the IRS in early December 2018, Defendant took six months to draft an agreement for the new IRS.

28.     After numerous confusing and inconsistent communications from Defendant regarding what Plaintiff was supposed to provide to Defendant to begin the new IRS, finally the agreement (the "IRS Agreement") was presented to Plaintiff on May 22, 2019 and signed by Plaintiff on May 28, 2019.

29.     Many months after the IRS Agreement was executed, Defendant reinterpreted it, without prior notice to Plaintiff, as including a new study of the voltage source control model.

30.     A new study of the voltage source control model was not specified in the IRS Agreement, and it is not reasonably necessary for the Project to provide all the Services required in the PPA.

31.     Notwithstanding all the correspondence and discussion that took place before the IRS Agreement was executed, Defendant continued to make inconsistent

and confusing demands upon Plaintiff regarding information and models supposedly needed to commence the IRS.

32.    On September 13, 2019, a telephone conference was attended by representatives of Plaintiff and Defendant to discuss Plaintiff's concerns about Defendant's expansion of the new IRS and its effect on the GCOD and Plaintiff's financing for the Project.

33.    In the September 13, 2019 conference, it was agreed, among other things, to complete the IRS work in progress with the models that had been provided and in a manner suitable to provide an adequate assurance of project status for financing, and it was tentatively agreed to complete any follow-up IRS analyses while Plaintiff constructs the project, so as to not further delay GCOD.

34.    Notwithstanding the September 13, 2019 agreements, Defendant categorically refused to agree that Plaintiff is entitled to any grace period in connection with meeting the GCOD milestone, notwithstanding that Defendant's own inexcusable delays are preventing Plaintiff from meeting such deadline.

35.    Moreover, while Defendant indicated that, in principle, it was willing to grant MNEP a 60-day extension of GCOD, Defendant insisted that such extension would be conditioned upon: (1) imposition of liquidated damages in a cumulative fashion (i.e., separately per day per each milestone missed, as opposed to per day

when any milestone is missed); and (2) a re-confirmation of Defendant's right to terminate the PPA 180 days after the extended GCOD date is missed.

36.     In fact, Defendant had repeatedly offered to Plaintiff to terminate the PPA "without penalties."

37.     This offer was not made in good faith as Defendant has been fully aware that such termination would result in Plaintiff losing its investment in the Project, which amounts to several million dollars.

38.     Between May 10, 2019 and July 29, 2020, Defendant assessed Plaintiff a total of $359,331.70 in liquidated damages purportedly under the PPA for missing various Guaranteed Project Milestone Dates, including GCOD.  Of that amount, Defendant collected the amount of $285,999.30 from the Security Fund deposited by Plaintiff, over Plaintiff's objections.

39.     The assessments and collection of Liquidated Damages by Defendant were improper because delays in reaching Guaranteed Project Milestone Dates were caused by Defendant's own failure to act timely and reasonably in its performance of the PPA.

40.     On June 23, 2020, Defendant issued a Notice of Default and Termination, purportedly under the PPA, declaring Plaintiff in default under the PPA and terminating the PPA effective July 10, 2020 because of Plaintiff's failure to

reach the Interconnection Milestone by June 22, 2020, and Plaintiff's inability to reach the GCOD by June 28, 2020.

41.    The termination of the PPA was wrongful because delays in reaching guaranteed milestones were caused by Defendant's own failure to act timely and reasonably in its performance of the PPA.

42.    As a result of the termination of the PPA, Plaintiff has lost its investment in the Project, has been exposed to claims by its own vendors and contractors, and has incurred other and further damages.

43.    Plaintiff has at all relevant times faithfully and timely performed its obligations under the PPA, and to the extent that it may have failed to do so, any such failure is either excused because it was prevented or hindered by Defendant's conduct, or has otherwise been cured.

## COUNT I
## Breach of Contract:  Section 13.3 of the PPA

44.    Plaintiff incorporates the allegations set forth in paragraphs 1-38 above as if fully set forth herein.

45.    Article 13.3(B) of the PPA requires Defendant to perform in a timely manner and entitles Plaintiff to a grace period following a Guaranteed Project Milestone Date equal to the duration of the period of delay directly caused by such failure in Defendant's timely performance.

46.     Defendant has breached Section 13.3(B) of the PPA, by, among other things:

    a.  failing to timely act in connection with the IRS including issuing a scope or agreement and beginning initial discussions with Plaintiff;

    b.  failing to timely provide key models and technical guidance to productively advance the IRS;

    c.  failing to timely retain and instruct expert consultants and move the IRS forward;

    d.  failing to timely communicate its expanded scope of the IRS to Plaintiff;

    e.  failing to timely complete the IRS in accordance with its own guidance;

    f.  refusing to credit grace periods to Plaintiff to which Plaintiff is entitled because of Defendant's untimely performance;

    g.  assessing and collecting liquidated damages from Plaintiff for delays in reaching Guaranteed Project Milestone Dates, including GCOD, which delays were caused by Defendant's untimely performance;

h. terminating the PPA purportedly on account of Plaintiff's failure and inability to reach Guaranteed Project Milestone Dates, including GCOD, which was caused by Defendant's untimely performance.

47. By its breaches of Article 13.3(B) of the PPA, Defendant has hindered and prevented Plaintiff from performing Plaintiff's obligations under the PPA, thus excusing Plaintiff's failure to perform such obligations, including meeting the Guaranteed Project Milestone Dates, and in particular, the GCOD.

48. By its breaches of Article 13.3(B) of the PPA, Defendant has wrongfully assessed a total of $359,331.70 and collected the amount of $285,999.30 in liquidated damages against Plaintiff purportedly under Section 13.4 of the PPA for failure to meet the Guaranteed Project Milestone Dates, and in particular, the GCOD.

49. By its breaches of Article 13.3(B) of the PPA, Defendant has terminated the PPA purportedly for Plaintiff's failure and inability to meet the Guaranteed Project Milestone Dates, and in particular, the GCOD, under Section 13.4(B) of the PPA, causing Plaintiff to lose its entire investment in the project and incur other losses and damages.

50. Plaintiff is entitled to recover from Defendant any and all past, present and future damages caused by Defendant's breaches of its obligations under Section

11

13.3 of the PPA, the amount of which Plaintiff prays leave to prove at trial, including, but not limited to, reimbursement of any and all liquidated damages collected from the Security Fund advanced by Plaintiff, Plaintiff's investment in the Project, and recovery of all benefits that Plaintiff would have derived from the PPA but for Defendant's breach thereof.

## COUNT II
## Breach of Contract:  Section 13.4 of the PPA

51.     Plaintiff incorporates the allegations set forth in paragraphs 1-45 above as if fully set forth herein.

52.     From October 9, 2019 on, Defendant has taken a categorical position that per day liquidated delay damages under Section 13.4 of the PPA would be imposed separately and cumulatively for each missed Guaranteed Project Milestone until each such milestone has been met.

53.     Between April 3, 2020 and July 29, 2020, Plaintiff assessed $158,388.28 in cumulative and duplicative liquidated damages against Plaintiff, and collected $126,132.76 of damages so assessed from the Security Fund deposited by Plaintiff, over Plaintiff's objections.

54.     Defendant's conduct is in breach of Section 13.4 of the PPA, which nowhere authorizes cumulative imposition of per day liquidated delay damages, and is also contrary to Hawaii law, which does not allow punitive provisions in contracts

and requires that liquidated damages be proportionate to actual damages and/or damages reasonably estimated at the time of contracting.

55.     Notwithstanding whether or not Defendant was entitled to assess any liquidated damages to begin with, Plaintiff is entitled to recover from Defendant all cumulative and duplicative liquidated damages collected by Defendant, in the amount of $126,132.76.

## COUNT III
## Breach of Contract:  The IRS Agreement

56.     Plaintiff incorporates the allegations set forth in paragraphs 1-49 above as if fully set forth herein.

57.     The IRS Agreement is a separate contract related to the PPA.

58.     The IRS Agreement defined the scope of information required of Plaintiff in Section 1.

59.     The IRS Agreement defined the scope of the New IRS in Section 2.

60.     By its own terms, Section 1 requires Plaintiff to edit certain source models as per Defendant's technical specifications, and return these models to Defendant, not to conduct any studies based on such models.

61.     Defendant breached Section 1 of the IRS Agreement by its failure to provide source models in a timely manner to Plaintiff in order for Plaintiff to begin its own modeling work for the IRS.

62.     Defendant's failure to provide source models to Plaintiff in a timely manner has caused a delay in the completion of the IRS and hampered and prevented Plaintiff from reaching GCOD, thus wrongfully exposing Plaintiff to liquidated damages under PPA Section 13.4(A) and potential termination of the project under PPA Section 13.4(B).

63.     By its own terms, the IRS Agreement does not require Plaintiff to provide the ASPEN model.  Plaintiff had been requesting the ASPEN model from the Plaintiff since February 2019 to allow Plaintiff to begin working with the ASPEN model, but Defendant did not give Plaintiff access to the Aspen model for months.

64.     Despite the IRS Agreement not requiring Plaintiff to provide the ASPEN model, Defendant demanded that Plaintiff deliver the ASPEN model on or about June 27, 2019.

65.     After substantial time had been lost due to Defendant's ASPEN model issue, Defendant provided the model to Plaintiff on August 5, 2019.

66.     Defendant breached Sections 1 and/or 2 of the IRS Agreement by its demand and insistence that Plaintiff deliver the ASPEN Model.

67.     Defendant's demand and insistence on Plaintiff delivering the ASPEN model has caused delay and hampered and prevented Plaintiff from reaching GCOD, thus wrongfully exposing Plaintiff to liquidated damages under PPA Section 13.4(A) and potential termination of the project under PPA Section 13.4(B).

68.     By their own terms, Sections 1 and 2 do not list a voltage source control model or require a specific study of the voltage source control model of the substitute equipment.  The IRS Agreement does not so require notwithstanding that Plaintiff informed Defendant that Tesla did not have an existing voltage source control model for its equipment on May 15, 2019 before the IRS Agreement was issued or signed.

69.     Defendant breached Sections 1 and/or 2 of the IRS Agreement by its insistence that it would need to conduct a study of voltage source control model of the substitute equipment many months after the IRS Agreement was signed, and that a favorable conclusion of such study would be a precondition of a successful completion of the IRS.

70.     Defendant's demand and insistence on a study of voltage source control model of the substitute equipment being a precondition for completion of the IRS and its failure to timely inform Plaintiff of such requirement has caused delay and hampered and prevented Plaintiff from reaching GCOD, thus wrongfully exposing Plaintiff to liquidated damages under PPA Section 13.4(A) and termination of the project under PPA Section 13.4(B).

71.     Plaintiff is entitled to recover from Defendant any and all past, present and future damages caused by Defendant's breaches of the IRS Agreement, the amount of which Plaintiff prays leave to prove at trial.

## COUNT IV
## Breach of Contract:  Breach of the Implied Covenant of Good Faith and Fair Dealing

72.     Plaintiff incorporates the allegations set forth in paragraphs 1-65 above as if fully set forth herein.

73.     Under Hawaii law, the covenant of good faith and fair dealing is implied in the PPA and the IRS Agreement.

74.     Defendant's conduct described above, both in particular instances and in its totality, was not consistent with good faith and fair dealing, but instead constituted a course of conduct intended to deprive Plaintiff of the benefit of the PPA and the IRS Agreement.  This conduct includes, but is not limited to the following:

  a.  Defendant's unreasonable and unjustified failure to timely and meaningfully cooperate with Plaintiff in connection with the new IRS it required after being advised in 2018 of the change in equipment to be used by Plaintiff;

  b.  Defendant's unreasonable and unjustified failure to timely provide the necessary source models to Plaintiff;

  c.  Defendant's unreasonable and unjustified failure to contract for the IRS until the end of May 2019;

  d.  Defendant's unreasonable and unjustified failure to put into the IRS Agreement and notify Plaintiff that a voltage source control

16

model would need to be provided by Plaintiff despite Defendant apparently being aware of such requirement on May 15, 2019.

e.  Defendant's inconsistent and shifting demands on Plaintiff as to what should be studied and what information was required of Plaintiff;

f.  The pretextual nature of Defendant's insistence that Plaintiff deliver the ASPEN model when this was not required by the IRS Agreement and was not provided by Defendant despite Plaintiff's numerous requests for access to the Aspen model over several months so that Plaintiff could begin working with the Aspen model;

g.  Defendant's unreasonable reinterpretation of the IRS Agreement after it was signed and imposition upon Plaintiff of new requirements that were not set forth in the IRS Agreement;

h.  The pretextual nature of the requirement for a further additional study of the voltage source control model, which is not relevant to the Services required by the PPA;

i.  The pretextual nature of arguments made by Defendant in support of the new requirement to study the voltage source control model, namely zero diesel generator operation, when the

PPA never anticipated or required Plaintiff to provide a full redundant back-up for Defendant's generating facility, and the Project was not sized for such purpose;

j.  Defendant's unreasonable and unjustified failure and refusal to accept the results of the previously conducted IRSs to the extent they were also applicable to the new equipment proposed by Plaintiff;

k.  Defendant's unreasonable and unjustified failure and refusal to acknowledge the finding in the Tesla IRS report that the new equipment would provide equal or better performance than the original equipment;

l.  Defendant's unreasonable and unjustified failure and refusal to cooperate with Plaintiff in reasonably resolving technical issues raised by Defendant in a manner that would not delay the GCOD or jeopardize the financing of the Project, as promised by Defendant in the September 13, 2019 conference;

m. Defendant's disingenuous and pretextual assessment and collection of liquidated damages on the stated basis of Plaintiff's delays in reaching the Guaranteed Project Milestone Dates, including the GCOD, which delays were due to Defendant's own

unreasonable, dilatory and obstructive conduct in its ostensible performance of the PPA, and in amounts that bear no relation to Defendant's anticipated or potential damages, including duplicative and cumulative damages that are contrary to Hawaii law.

n.  Defendant's disingenuous and pretextual termination of the PPA on the basis of delays and inability to meet the Guaranteed Project Milestone Dates, including the GCOD, which delay and inability was due to Defendant's own unreasonable, dilatory and obstructive conduct in its ostensible performance of the PPA.

75.     In sum, from the end of 2018 onwards, Defendant was actively trying, in bad faith, to scuttle the PPA and the Project by pretending to be performing the PPA and the IRS Agreement, while in fact Defendant was obstructing and sabotaging Plaintiff's performance of both, and setting Plaintiff up for failure, with intent to deprive Plaintiff of the benefit of the PPA and the IRS Agreement.

76.     As such, Defendant breached the PPA and the IRS Agreement notwithstanding whether or not its conduct also constituted a breach of any particular provision of the PPA and/or the IRS Agreement.

77.     By its bad faith conduct, Defendant has hindered and prevented Plaintiff from performing Plaintiff's obligations under the PPA, thus excusing

Plaintiff's failure to perform such obligations, including meeting the Guaranteed Project Milestone Dates, and in particular, the GCOD.

78.     Defendant has wrongfully and in bad faith assessed a total of $359,331.70 and collected the amount of $285,999.30 in liquidated damages from Plaintiff for purported delays which were caused by Defendant's own unreasonable, dilatory and obstructive conduct in its ostensible performance of the PPA.

79.     Defendant has wrongfully and in bad faith orchestrated termination of the PPA for Plaintiff's purported failure and inability to meet the Guaranteed Project Milestone Dates, and in particular, the GCOD, where such failures and inability were caused by Defendant's own unreasonable, dilatory and obstructive conduct in its ostensible performance of the PPA, and thus caused Plaintiff to lose its entire investment in the project.

80.     Plaintiff is entitled to recover from Defendant any and all past, present and future damages caused by Defendant's bad faith conduct, the amount of which Plaintiff prays leave to prove at trial including, but not limited to, reimbursement of any and all liquidated damages collected from the Security Fund advanced by Plaintiff, Plaintiff's investment in the Project, and recovery of all benefits that Plaintiff would have derived from the PPA and the IRS Agreement but for Defendant's bad faith conduct.

Wherefore, Plaintiff prays that judgment be entered in its favor and against Defendant, adjudging Defendant to be liable for any and all damages that Plaintiff has sustained as pleaded above, including interest, attorneys' fees and such further and other relief as may be just and proper.

DATED:  Honolulu, Hawai'i, August 26, 2020.

/s/ Christian K. Adams
CHRISTIAN K. ADAMS
NENAD KREK
Attorneys for Plaintiff
MOLOKAI NEW ENERGY
PARTNERS, LLC