IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MOLOKAI NEW ENERGY PARTNERS, LLC,<br><br>   Plaintiff,<br><br> vs.<br><br>MAUI ELECTRIC COMPANY, LIMITED,<br><br>   Defendant. | Civ. No. 20-00134 JMS-KJM<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MAUI ELECTRIC COMPANY, LIMITED'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 38 |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MAUI ELECTRIC COMPANY, LIMITED'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 38**

## I.  INTRODUCTION

Defendant Maui Electric Company ("MECO") moves for summary judgment as to all claims brought by Plaintiff Molokai New Energy Partners ("MNEP") in this diversity-of-citizenship action under 28 U.S.C. § 1332.  The suit stems from missed deadlines and the cancellation of a Power Purchase Agreement ("PPA") under which MNEP was to develop a solar power energy facility on Molokai using a battery energy storage system ("BESS") and then sell energy to MECO.  MECO terminated the PPA after MNEP failed to meet a guaranteed commercial operations deadline ("GCOD") and other guaranteed project milestone

dates ("GPMDs").  MNEP's suit basically alleges that MNEP was unable to meet the deadlines because MECO had breached provisions of the PPA that would have given MNEP grace periods from deadlines, and that MECO improperly assessed amounts of liquidated damages ("LDs").[1]

      MECO's motion contends that MNEP cannot prove that MECO breached the PPA's grace-period provisions, and that the PPA placed the risk of delay solely on MNEP.  MECO also argues that it correctly imposed LD amounts based on clear PPA language, and that MNEP's separate claim for breach of an implied contractual covenant of good faith and fair dealing fails either factually or legally.  Based on the following, the motion is GRANTED as to Count Four (breach of a covenant of good faith and fair dealing) and DENIED as to Counts One through Three (the express breach-of-contract counts).

## II. <u>BACKGROUND</u>

      The parties know the details of this dispute involving electrical engineering, contractual provisions, and related technical correspondence—the

---

[1] Throughout this order, the court adopts the many acronyms used by the parties in their briefing and exhibits.  Although perhaps unavoidable in this situation, the case aptly demonstrates that in legal writing "[o]ne day we may all be buried in acronyms."  Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 120 (2008) (quoting John Algeo); *see also Delaware Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1321 (D.C. Cir. 2004) ("The use of obscure acronyms, sometimes those made up for a particular case, is an aggravating development of the last twenty years.  Even with a glossary, a judge finds himself or herself constantly looking back to recall what an acronym means.") (Silberman, J., concurring).

court need not reiterate all the specifics here.  At the risk of oversimplification,

however, the court begins with a "30,000 foot view" of the issues to provide

context.

The January 24, 2018 PPA between MNEP and MECO (approved by

the Hawaii Public Utilities Commission on July 30, 2018) appears to have required

voltage source control ("VSC") functionality to connect the BESS to the Molokai

power grid.  *See, e.g.*, ECF No. 39-4 at PageID # 257; ECF No. 39-14 at PageID

# 355.  In November 2018, MNEP formally proposed to change from previously-

approved equipment supplied by S&C Electric Company to equipment supplied by

Tesla.  *See* ECF No. 39-15.  This change prompted MECO to require, invoking

terms of the PPA, a revision to (or a new version of) an interconnection

requirements study ("IRS").  *See* ECF No. 39-16.  Over six months later, on May

28, 2019, MNEP and MECO entered into a "Tesla IRS agreement" whereby

MECO would produce a Tesla IRS (which was to be done by a third-party

contractor, Electranix Corporation) analyzing the Tesla equipment's connection to

the Molokai grid.  *See* ECF No. 39-22 at PageID # 385.  But by the time the Tesla

IRS was fully completed (including a later addendum assessing VSC functionality)

in April 2020, the final GCOD and other deadlines had passed.  MECO had been

imposing LDs in the meantime and terminated the PPA on June 23, 2020 (after

MNEP had filed the present lawsuit on March 25, 2020, ECF No. 1) based upon

MNEP's missed deadlines.  *See* ECF No. 39-33 at PageID ## 436-62 (imposing

LDs); ECF No. 39-35 at PageID # 494 (termination).

MNEP contends that it missed applicable PPA deadlines because

MECO failed to timely perform its own obligations relating to the Tesla IRS

agreement (both in unreasonably delaying entry into the Tesla IRS agreement, and

then in failing to meet requirements in timely completing the Tesla IRS itself).

MNEP invokes § 13.3(B) of the PPA, which gives MNEP grace periods from

milestone dates as follows:

> [I]f the failure to achieve a Guaranteed Project Milestone
> by the applicable Guaranteed Project Milestone Date is
> *the result of any failure* by [MECO] in the timely
> performance of its obligations under this Agreement,
> [MNEP] *shall be entitled to a grace period following
> such Guaranteed Project Milestone Date (as applicable)
> equal to the duration of the period of delay directly
> caused by such failure in [MECO's] timely performance.*
> Such grace period on the terms described above shall be
> [MNEP's] sole remedy for any such failure by [MECO].
> For purposes of this Section 13.3(B), [MECO's]
> *performance will be deemed to be "timely" if it is
> accomplished within the time period specified in this
> Agreement with respect to such performance or, if no
> time period is specified, within a reasonable period of
> time.*  If the performance in question is [MECO's] review
> of plans, the determination of what is a "reasonable
> period of time" will take into account [MECO's] past
> practices in reviewing and commenting on plans for
> similar facilities.

4

ECF No. 39-4 at PageID ## 245-46 (emphases added).

The First Amended Complaint ("FAC") alleges four counts: Count One alleges a breach of contract as to § 13.3(B) of the PPA regarding grace periods; Count Two alleges a breach of contract as to § 13.4 of the PPA regarding imposition of LDs against MNEP for failing to meet certain deadlines; Count Three alleges a breach of contract against MECO regarding the Tesla IRS agreement; and Count Four asserts a breach of contract (not a tort) for MECO's alleged breaches of the implied covenant of good faith and fair dealing that is implied in both the PPA and the Tesla IRS agreement. *See* ECF No. 21 at PageID ## 120-31.

Much of the present dispute concerns the terms or conditions of the Tesla IRS agreement, such as whether the Tesla IRS was required to include an analysis of VSC functionality and what types of computer modeling were necessary (and who was to provide it)—models known to the parties as PSS/E, ASPEN, and PSCAD. More generally, there are allegations about whether MECO acted in a "commercially reasonable" manner to complete the Tesla IRS in a timely fashion.

At the July 6, 2021 hearing on MECO's motion, the court

announced its conclusion that, after reviewing the written submissions, genuine issues of fact exist on the merits of at least two of the breach-of-contract claims.[2] In particular, the court assumes at this stage that the proffered declarations of Mike Luo, Upshur Quinby, and Baljinder Sahdra (a proffered expert) are true.[3]  *See* ECF Nos. 46-1, 46-13 & 46-40.  And when construing the evidence in the light most favorable to MNEP, questions of fact exist as to Count One concerning whether MECO used "commercially reasonable efforts" to fulfill its obligations regarding the new IRS as required in § 5(f) of Attachment A to the PPA.  ECF No. 39-4 at PageID # 254.  Similarly, as to Count Three, genuine issues of fact exist as to whether MECO used "reasonable efforts" and whether information (for example, information regarding source modeling) was "reasonably requested" or was

---

[2] When considering evidence submitted with a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party.  *See, e.g.*, *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1184 (9th Cir. 2016).

[3] MECO's Reply argues that Sahdra's opinions are inadmissible and that they fail to meet requirements of Federal Rule of Evidence 702.  *See* ECF No. 48 at PageID ## 789-90.  The court, however, accepts the opinions at this summary judgment stage, especially where no independent motion has been made challenging the opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and MNEP has not had an opportunity to respond to MECO's arguments made in its Reply.  *See, e.g.*, *Cabasug v. Crane Co.*, 989 F. Supp. 2d 1027, 1044 n.10 (D. Haw. 2013) ("[T]o the extent Defendants argue that the [expert's] Declarations are not admissible pursuant to Federal Rule of Evidence 702, the parties have not briefed the issue in anything more than a cursory way as part of their summary judgment arguments, and the court declines to resolve the expert admissibility issues on the record before it.") (citations omitted), *abrogated on other grounds by Air & Liquid Sys. Corp. v. Devries*, 139 S. Ct. 986 (2019).

"reasonably necessary" as those terms are used in the Tesla IRS agreement.  *See* ECF No. 39-22 at PageID # 386.

However, as the court also explained at the July 6, 2021 hearing, whether those factual disputes are dispositive of MECO's motion depends upon how the court resolves threshold issues of law interpreting applicable contractual language.  That is, if the court construes contractual language as suggested by MECO, then there might be no breach of contract *regardless* of the factual disputes (essentially rendering the factual disputes not "material" for purposes of Federal Rule of Civil Procedure 56(a)).  Likewise, Count Two depends upon a threshold interpretation of the meaning of the PPA's LD provisions, including whether they are ambiguous.  Thus, the July 6, 2021 hearing focused on those threshold questions of law, and this Order is therefore limited to addressing those questions of contractual interpretation.  The court now turns to those issues.

### III. <u>ANALYSIS</u>

### A.   Count One—Breach of PPA § 13.3(B)

MNEP's November 2018 proposed change to Tesla equipment triggered § 5(f) of Attachment A to the PPA.  Section 5(f) allows MECO "in its reasonable discretion" to require a "re-study or revision" to the existing IRS for certain equipment changes.  ECF No. 39-4 at PageID # 254.  If MECO decides that

7

a "re-study or revision" to an IRS is necessary, § 5(f) then requires MECO to

"promptly initiate such IRS or Supplemental IRS re-study or revision" and "to use

commercially reasonable efforts . . . to complete any necessary reviews, approvals

and/or re-studies or revisions to the IRS or the Supplemental IRS." *Id*.  Count One

alleges that MECO failed to comply with its obligations under § 5(f), and thus

breached PPA § 13.3(B) ("[I]f the failure to achieve a Guaranteed Project

Milestone by the applicable Guaranteed Project Milestone Date is the result of any

failure by [MECO] in the timely performance of its obligations under this

Agreement, [MNEP] shall be entitled to a grace period. . .") by failing to recognize

certain grace periods.

        Section 5(f) reads in full as follows:

> At any time during the Term, Seller [MNEP] may submit
> revisions to this Section 5 (Equipment) of Attachment A
> (Description of Generation and Conversion Facility)
> ("Section 5") for Company's [MECO's] review, which
> review shall occur prior to commencement of
> construction of any such revisions to the Facility,
> provided, however, that (i) no such revision to this
> Section 5 shall change the type of Facility or conversion
> equipment deployed at the Facility from a solar energy
> conversion facility using photovoltaic equipment and a
> Battery Energy Storage System ("BESS"); (ii) no such
> revision shall increase the Contract Capacity; (iii) Seller
> shall be in compliance with all other terms and conditions
> of this Agreement; and (iv) such revision(s) shall not
> change the characteristics of the Facility equipment or
> the specifications used in the IRS and the Supplemental

IRS. If Seller's proposed revisions satisfy all of items (i)-(iv) above, and Company, in its reasonable discretion, determines based on its review of the proposed revision(s) that no re-study or revision to the IRS or Supplemental IRS is required, Seller shall have the right to make the proposed changes to its Facility, and the proposed revisions to this Section 5 shall take effect upon the completion of such changes. *If Seller's proposed revision(s) to this Section 5 otherwise satisfies items (i), (ii) and (iii) above but not item (iv) such that Company, in its reasonable discretion, determines based on its review of the proposed revision(s) that a re-study or revision to all or any part of the IRS or the Supplemental IRS is required to accommodate Seller's proposed revision(s), Company shall promptly initiate such IRS or Supplemental IRS re-study or revision, and such revisions to this Section 5 shall be conditional on a satisfactory completion of such re-study or revision to the IRS or Supplemental IRS* and Seller's payment and continued obligation to be liable and responsible for all costs and expenses of re-studying or revising such portions of the IRS or the Supplemental IRS and for modifying and paying for all costs and expenses of modification to the Facility, the Company-Owned Interconnection Facilities based on the results of the re-studies or revisions to the IRS.

Seller understands and acknowledges that any necessary re-studies or revisions to the IRS or the Supplemental shall be subject to Company's then-existing time and personnel constraints. *Company agrees to use commercially reasonable efforts, under such time and personnel constraints, to complete any necessary reviews, approvals and/or re-studies or revisions to the IRS or the Supplemental IRS.*

Seller and Company further acknowledge and agree that Seller currently anticipates increasing the size of the

> BESS in the 11th Contract Year, subject to and as provided in this Section 5(f).
>
> Any delay in completing, or failure by Seller to meet, any *subsequent* Seller milestones under Article 13 (Guaranteed Project Milestones Including the Guaranteed Commercial Operations Date) *as a result of any revision pursuant to this Section 5 by Seller* (whether requiring a re-study or revision to the IRS or the Supplemental IRS or not) shall be borne entirely by Seller and Company shall not be responsible or liable for any delay or failure to meet any such milestones by Seller.

*Id*. at PageID ## 253-55 (emphases added).

MECO determined that MNEP's proposed change from S&C to Tesla equipment required a new/revised IRS under the first paragraph of § 5(f) ("If [MECO] . . . in its reasonable discretion, determines based on its review of the proposed revision(s) that a re-study or revision to all or any part of the IRS or the Supplemental IRS is required to accommodate Seller's proposed revision(s), Company shall promptly initiate such IRS or Supplemental IRS re-study or revision[.]").  As explained above, the court has determined that questions of fact exist as to whether MECO met its corresponding contractual obligations to "promptly initiate such IRS or Supplemental IRS re-study or revision," and "to use commercially reasonable efforts, under such time and personnel constraints, to complete any necessary reviews, approvals and/or re-studies or revisions to the IRS or the Supplemental IRS."  *Id.* at PageID # 254.

MECO, however, argues that the last paragraph of § 5(f) absolves it of liability for the asserted breach of contract, regardless of the questions of fact.  To reiterate, that last paragraph states:

> Any delay in completing, or failure by Seller to meet, any subsequent Seller milestones under Article 13 (Guaranteed Project Milestones Including the Guaranteed Commercial Operations Date) as a result of any revision pursuant to this Section 5 by Seller (whether requiring a re-study or revision to the IRS or the Supplemental IRS or not) shall be borne entirely by Seller and Company shall not be responsible or liable for any delay or failure to meet any such milestones by Seller.

*Id.* at PageID # 255.  MECO contends that, under the paragraph's plain meaning, *any* delays that are the result of equipment changes ("as a result of any revision pursuant to this Section 5 by [MNEP]") in meeting project milestones including the GCOD are "borne entirely by" MNEP.  In contends that, under the paragraph's plain meaning, MECO "shall not be responsible or liable for any delay or failure to meet any" defined milestones that result from MNEP's equipment changes under Section 5.  MECO further contends that, under the paragraph's plain meaning, MNEP bears responsibility for missing deadlines and MECO is "not . . . responsible or liable," whether or not the change required a new or revised IRS.[4]

---

[4] At the July 6, 2021 hearing, MECO explained its position that "subsequent" project milestones in the last paragraph of § 5(f) refers to milestones that had not already passed and remained to be done when the request to change equipment was made.

MECO apparently took this position as early as January 2019 when it told MNEP it would not extend the GCOD, summarizing a meeting as follows:

> Further [MECO] informed MNEP that relief from the [GCOD] of January 30, 2020 will not be given despite the Proposal and the New IRS requirement. As previously discussed, the New IRS could take up to 12 months to complete. We understand that in order for MNEP to meet GCOD, MNEP indicated it would need to proceed with contracting with Tesla before the New IRS is completed. As discussed, the purchase of the Tesla equipment prior to the completion of the New IRS is a risk borne by MNEP.

ECF No. 46-2 at PageID # 586 (Jan. 23, 2019 letter from Joseph Streeter of MECO to Mike Luo of MNEP). MECO reaffirmed its "plain meaning" position in March 2019, telling MNEP:

> Further, [MECO] reaffirms its position that pursuant to the express terms of the PPA, relief from the [GCOD] of January 30, 2020 will not be given due to a delay attributable to the need to conduct the New IRS that is being completed solely because of MNEP's November 19, 2018 Proposal [to change to Tesla equipment].

ECF No. 46-3 at PageID # 588 (Mar. 26, 2019 letter from Streeter to Luo).

But "plain meaning, like beauty, is sometimes in the eye of the beholder." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985). The last paragraph of § 5(f) does not stand alone; it must be read in conjunction with the rest of § 5(f). And § 5(f) itself must be read in conjunction with the rest of the

PPA—in particular, with § 13.3(B) regarding grace periods. *See, e.g., Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 130 Haw. 36, 45, 305 P.3d 452, 461 (2013) ("The court's objective is 'to ascertain and effectuate the intention of the parties as manifested by the contract in its entirety.'") (quoting *Brown v. KFC Nat'l Mgmt. Co.*, 82 Haw. 226, 240, 921 P.2d 146, 160 (1996)); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993) ("Under Hawaii law a legal agreement should be construed as a whole and its meaning determined from the entire context and not from any one part, word, phrase, or clause.") (citing *Maui Land & Pineapple Co. v. Dillingham*, 67 Haw. 4, 11, 674 P.2d 390, 395 (1984)).[5]

MECO's reading—that the last paragraph of § 5(f) necessarily absolves it of any responsibility for MNEP missing deadlines because MNEP changed to Tesla equipment, or that MNEP is not entitled to grace periods under § 13.3(B)—would render the balance of § 5(f) superfluous and, in this context, could render § 13.3(B) illusory. MECO's position would mean that grace periods

---

[5] Substantive Hawaii law applies in this diversity action. *See, e.g., Tuomela v. Waldorf-Astoria Grand Wailea Hotel*, 2021 WL 233695, at *3 (D. Haw. Jan. 22, 2021) ("Under the *Erie* doctrine, the court applies substantive Hawaii law in the present case, which is based on diversity of citizenship.") (citation omitted). Although the parties have not provided the court with the entire PPA, neither side has indicated that the PPA contains a choice-of-law clause specifying that any other state's law applies. And, in fact, the Tesla IRS agreement includes a clause choosing Hawaii law. *See* ECF No. 39-22 at PageID # 387.

were *never* possible (or required) even if MECO failed (in *any* circumstances) to

meet any of the conditions in § 5(f) such as "promptly initiating" an "IRS or

Supplemental IRS re-study or revision," or using "commercially reasonable

efforts."  MECO could simply ignore those provisions and then the supplemental

IRS (which it required) might never get done.  As MNEP's Opposition argues,

"MECO's interpretation would allow MECO to do nothing after it received and

acknowledged MNEP's request for equipment change, and run the clock on MNEP

until the contractual deadlines . . . have been missed."  ECF No. 46 at PageID

# 565.  In short, MECO's position is inconsistent with well-established principles

of contract interpretation.  *See, e.g.*, *Stanford Carr Dev. Corp. v. United House,*

*Inc.*, 111 Haw. 286, 297, 141 P.3d 459, 470 (2006) ("We have long expressed our

disapproval of interpreting a contract such that any provision be rendered

meaningless.") (citations omitted); Restatement (Second) of Contracts § 203(a)

("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all

the terms is preferred to an interpretation which leaves a part unreasonable,

unlawful, or of no effect [.]") (cited with approval in *Stanford Carr*); *see also*

Restatement (Second) of Contracts § 203(a) cmt. b ("Since an agreement

is interpreted as a whole, it is assumed in the first instance that no part of it is

superfluous.").

This reasoning is bolstered by the provision that once MECO required a new or supplemental IRS, that IRS had to be satisfactorily completed before any equipment change became effective; § 5(f) states that "such revisions to this Section 5 shall be conditional on a satisfactory completion of such re-study or revision to the IRS or Supplemental IRS. . . ."  ECF No. 39-4 at PageID # 254. Effectively then, under MECO's reading of the provisions, MECO could control whether the equipment changes took effect (and thereby could control whether MNEP could meet the GCOD at all simply by delaying completion of the IRS). Again, such an interpretation runs afoul of established Hawaii law.  *See, e.g.*, *Stanford Carr*, 111 Haw. at 300, 141 P.3d at 473 ("[A] party who breaches or causes the other party to breach an agreement cannot enforce the agreement to his or her benefit."); *Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 272, 506 P.2d 9, 12 (1973) ("The general rule is that where a person by his own act makes impossible the performance or the happening of a condition such nonperformance should not relieve him from his obligation under a contract."); *Kalinowski v. Yeh*, 9 Haw. App. 473, 478, 847 P.2d 673, 677 (1993) ("[N]o person can defend against contractual liability on grounds of a condition precedent when he or she is responsible for that condition precedent not being complied with.") (quoting 2 A.

Corbin, *Corbin on Contracts* § 310 at 44-45 (1950 & Supp. 1992)) (internal

brackets omitted).

        As noted above, MECO reads "subsequent" in the last paragraph of

§ 5(f) ("Any delay in completing . . . any *subsequent* Seller milestones . . .") to

refer to any milestones that had not yet passed, i.e., that remained when the

equipment change was requested.  But that reading does not appear to take into

account the rest of the sentence, which refers to "any subsequent Seller milestones

. . . as a *result of any revision* pursuant to this Section 5 by Seller . . ." (emphasis

added).  It seems plausible that "subsequent" could refer to remaining deadlines

after the revisions to the PPA were completed (a process which would include

MECO's obligation to use "commercially reasonable efforts" to review or approve

a requested IRS or supplemental IRS).  Or "subsequent" could refer to any *new* or

*changed* milestones "as a result of any revision" to the PPA that occurred after an

approved equipment change.  In any event, the last paragraph of § 5(f) would seem

to apply only if MECO had also used "commercially reasonable efforts" to

complete "any necessary reviews, approvals and/or re-studies or revisions to the

IRS."  At this stage, the paragraph is ambiguous.  *See, e.g.*, *Airgo, Inc. v. Horizon

Cargo Transp., Inc.*, 66 Haw. 590, 594, 670 P.2d 1277, 1280 (1983) ("A contract is

ambiguous when the terms of the contract are reasonably susceptible to more than one meaning."). Its meaning is not plain.

It may be that MECO did not breach § 5(f)'s provisions. It may be that it acted in a commercially reasonable manner in procuring the Tesla IRS agreement and in production of the Tesla IRS itself. It may be that MNEP's failure to meet the project milestones was not a result of a failure of MECO to timely perform obligations under the PPA or under § 5(f). It may even be that MECO's reading was actually subjectively intended by both parties. But those are all disputed questions of material fact. It is enough, at this summary judgment stage, that the language of § 5(f) is ambiguous. Its last paragraph does not provide a basis to grant summary judgment as a matter of law in favor of MECO as to Count One.

**B.     Count Two—Breach of PPA § 13.4**

The PPA contains six project deadlines or GPMDs. *See* ECF No. 39-4 at PageID # 263. MECO imposed LDs of $1,466.66 per day for MNEP's failure to complete three of the deadlines, and did so cumulatively, i.e., it assessed daily LDs for each missed deadline even if LDs were already being assessed on that day for another missed deadline. ECF No. 39-33 at PageID ## 451-53, 457-62.

Count Two of the FAC alleges that imposing LDs in this manner, with double or triple LD amounts, breached PPA § 13.4 and also constituted improper punitive damages because the amounts were not proportionate to actual damages or amounts reasonably estimated at the time of contracting.  ECF No. 21 at PageID ## 123-24.  MECO argues that Count Two fails as a matter of law based on the plain meaning of the PPA's LD provisions.  It also argues that the amount of LDs cannot be punitive because they are capped and relate to harm that is difficult to measure.  *See* ECF No. 38-1 at PageID ## 206-07.

Section 13.4(A) of the PPA provides:

13.4   Damages and Termination.

(A)   Daily Delay Damages.  If a Guaranteed Project Milestone has not been achieved by the later of the Guaranteed Project Milestone Date or the expiration of any applicable grace period provided in Section 13.3 (Guaranteed Project Milestone Dates), Company shall collect and Seller shall pay liquidated damages in the amount of [$1,466.66][6] for each Day ("Daily Delay Damages") following the ninetieth (90th) Day following the Guaranteed Project Milestone Date or (if applicable) the ninetieth (90th) Day following expiration of such grace period that Seller fails to achieve the Guaranteed Project Milestone Date, provided that the number of Days for which Company shall collect and Seller shall pay Daily Delay Damages shall not exceed ninety (90) Days ("Guaranteed Project Milestone Period").

---

[6] Square brackets in original.

ECF No. 39-4 at PageID # 246.  Sections 13.5 and 13.6 provide:

> 13.5   <u>Payment of Daily Delay Damages</u>.  Company shall draw upon the Development Period Security for payment of the total Daily Delay Damages incurred by Seller.  If the Development Period Security is at any time insufficient to pay the amount of the draw to which Company is then entitled, Seller shall pay any such deficiency to Company promptly upon demand.  Any such payments made by Seller shall be refunded to Seller if such Seller achieves Commercial Operation at the Guaranteed Commercial Operations Date.
>
> 13.6   <u>Liquidated Damages Appropriate</u>.  Seller's inability to achieve Guaranteed Project Milestones may require Company to devote substantial additional resources for administration and oversight activities and Seller's inability to achieve Commercial Operations by the Guaranteed Commercial Operations Date may cause Company to not meet applicable [Renewable Portfolio Standard] requirements.  As such, Company may incur financial consequences for failure to meet such requirements.  Consequently, each Party agrees and acknowledges that the damages that Company would incur due to delay in achieving the Guaranteed Project Milestones would be difficult or impossible to calculate with certainty, the Daily Delay Damages set forth in Section 13.4 (Damages and Termination) are an appropriate approximation of such damages and the Daily Delay Damages are the sole and exclusive remedies for Seller's failure to achieve Commercial Operations by the Guaranteed Commercial Operations Date.

*Id.* at PageID # 247.

The court finds these provisions ambiguous as to whether they allow cumulative amounts of LDs for missing multiple deadlines.  Cumulative amounts are not mentioned at all.  If the harm to MECO for a missed deadline is a delayed benefit to MECO or Molokai consumers, then that delay appears to occur whether MNEP misses one deadline or multiple deadlines (perhaps depending on the nature of the deadline).  And the parties appear to agree that there must be "a 'reasonable relation' between the liquidated damages and the amount of the party's damages," *Am. Elec. Co., LLC v. Parsons RCI, Inc.*, 90 F. Supp. 3d 1079, 1084 (D. Haw. 2015) (citations omitted), and that "a liquidated damages clause that constitutes a penalty will not be enforced," *id.* (citation omitted).

Here, the record is insufficient for the court to conclude, as a matter of law, that imposing cumulative LDs was proper.  At minimum, the court lacks any evidence of MECO's actual damages or whether the total amount of LDs would bear some "reasonable" relationship to those actual damages.  Further, even if the damages are difficult to quantify (justifying a figure of $1,466 per day), that difficulty does not necessarily justify doubling or tripling the amount when two or three deadlines are missed.  Moreover, the proper amounts of LDs would also be contingent on whether MNEP prevails as to the other breach of contract counts—if MECO breached grace period provisions, then some or all LDs might have been

improperly assessed regardless of how they are measured.  MECO's motion as to

liquidated damages is DENIED.

## C.    Count Three—Breach of the Tesla IRS Agreement

As stated previously, the court has found disputed questions of fact

regarding the terms or conditions of the May 22, 2019 Tesla IRS agreement, which

provides in part:

> Company [MECO] shall use *reasonable efforts* to
> complete the IRS within 120 days after Company's
> receipt of MNEP's signed original of this IRS
> Agreement, payment for the IRS, *and all information and
> technical data reasonably requested by Company*.  Such
> time shall be extended, on a day-for-day basis, by the
> period of time required to obtain additional information
> and technical data *as may be reasonably necessary to
> conduct the IRS. . . .*  In the event of a delay for more
> than 120 days by MNEP in the provision of requested
> funding or data, Company shall have the option to cancel
> the IRS and terminate this IRS Agreement, whereupon
> MNEP shall be responsible for any actual costs incurred
> by Company as of the date of such termination.

ECF No. 39-22 at PageID # 386 (emphases added).  One of the primary factual

issues is whether a VSC component was part of the Tesla IRS agreement's scope

(even if it was a required part of the PPA, *see* ECF No. 39-4 at PageID # 257).

Because there is no specific language in the Tesla IRS agreement

itself requiring VSC functionality, MECO argues that the Tesla IRS agreement

necessarily incorporates the PPA's VSC requirement because the Tesla IRS

21

agreement and the PPA are part of the same transaction.  MECO thus argues that

"when determining what functions to study under the Tesla IRS [a]greement, the

PPA requirements must be read in [such that] the Tesla IRS was required to study

the Tesla equipment's VSC capability."  ECF No. 38-1 at PageID # 210.  The court

addresses this limited threshold issue of law here.

      Under Hawaii law, "'[a] writing is interpreted as a whole and all

writings forming a part of the same transaction are interpreted together.'"  *Anthony*

*v. Hilo Elec. Light Co.*, 50 Haw. 469, 457, 442 P.2d 64, 66-67 (1968) (quoting

Restatement (First) of Contracts § 235(c) (1932)).  This principle, however, does

not *necessarily* mean that all of the terms of the PPA are incorporated into the

Tesla IRS agreement.  The Tesla IRS agreement is a stand-alone contract, even if it

is related to the PPA.  Indeed, even if the documents are interpreted together, in

some circumstances where documents contain conflicting terms, the principle

actually creates ambiguity.  *See, e.g.*, *Khosravi-Babadi v. Haw. Telcom, Inc.*, 2018

WL 6729631, at *4 (D. Haw. Dec. 21, 2018).

      After analyzing the arguments and evidence, even considering the

Tesla IRS agreement and the PPA together as a larger transaction, the court cannot

conclude at this stage that the Tesla IRS agreement necessarily required a VSC

component for the corresponding Tesla IRS.  Rather, this remains a question of

material fact that the court cannot resolve at this summary judgment stage.  As

MNEP argues, "genuine issues of fact exist as to whether the [Tesla IRS

agreement] required a VSC Study, and if not, whether MECO breached the [Tesla

IRS agreement] by requiring that the VSC Study be performed as a prerequisite for

GCOD."  ECF No. 46 at PageID # 571.  Accordingly, the motion is DENIED as to

Count Three.

### D.   Count Four—Breach of Contract Based on a Breach of Implied Covenant of Good Faith and Fair Dealing

Lastly, MECO moves for summary judgment as to MNEP's separate

breach-of-contract claim in Count Four, which is based on alleged breaches of the

implied covenant of good faith and fair dealing (i.e., bad faith breach of contract)

in both the PPA and the Tesla IRS agreement.

"[E]very contract contains an implied covenant of good faith and fair

dealing that neither party will do anything that will deprive the other of the benefits

of the agreement."  *Simmons v. Puu*, 105 Haw. 112, 118, 94 P.3d 667, 673 (2004)

(quoting *Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Haw. 120, 123-24, 920 P.2d 334,

337-38 (1996)).  This good faith requirement "'emphasizes faithfulness to an

agreed common purpose and consistency with the justified expectations of the

other party.'"  *Hawaii Leasing v. Klein*, 5 Haw. App. 450, 456, 698 P.2d 309, 313

(1985) (quoting Restatement (Second) of Contracts § 205, cmt. a).[7]  A breach of

that covenant can form at least some basis for a breach of contract.  *See, e.g.*,

*Wieck v. CIT Grp., Inc.*, 308 F. Supp. 3d 1093, 1120 n.14 (D. Haw. 2018);

*Marisco, Ltd. v. GL Eng'g & Constr. Pte., Ltd.*, 2020 WL 3492572, at *5-7 (D.

Haw. June 26, 2020).

But with Count Four, MNEP alleges a breach-of-contract claim based

solely on allegations of bad faith, whether or not MECO also breached any express

provisions of the PPA or the Tesla IRS agreement.[8]  That is, Counts One, Two, and

Three of the FAC allege breaches of express contractual provisions, and Count

Four asserts a breach of contract based on bad faith, independent of any particular

contractual provision.  MECO argues that the claim fails as a matter of law because

it does not specify any particular contractual provision that was violated, and thus

---

[7] The commentary also defines "good faith performance," in part, as follows:

> A complete catalogue of types of bad faith is impossible, but the
> following types are among those which have been recognized in
> judicial decisions: evasion of the spirit of the bargain, lack of
> diligence and slacking off, willful rendering of imperfect
> performance, abuse of a power to specify terms, and interference
> with or failure to cooperate in the other party's performance.

Restatement (Second) of Contracts § 205, cmt. d.

[8] MNEP is not attempting to assert a *tort* of bad faith, which Hawaii has adopted at least
in an insurance context, *see Best Place*, 82 Haw. at 132, 920 P.2d at 346, but has never extended
to other contracts.  *See Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. P'ship*, 115 Haw.
201, 229, 166 P.3d 961, 989 (2007) ("[T]here is no tort of bad faith outside the context of
insurance claims").

duplicates and is subsumed within the other counts for breach of contract.  It also argues that there is insufficient evidence that MECO acted in bad faith to support an independent claim.

Decisions from this district interpreting Hawaii law have recognized a possible bad faith breach of contract claim "even when the party does not breach an explicit term of the contract."  *Marisco*, 2020 WL 3492572, at *6-7; *see also, e.g.*, *Television Events & Mktg., Inc. v. Amcon Distrib. Co*., 488 F. Supp. 2d 1071, 1080 (D. Haw. 2006) ("Consistent with the holding in [*McElroy v. Maryl Grp., Inc.*, 107 Haw. 423, 114 P.3d 929 (Haw. Ct. App. 2005)], TEAM's argument that it [cannot] be liable for an independent breach of its duty of good faith and fair dealing if it did not violate an explicit term of the contract is unavailing."); *Barranco v. 3D Sys. Corp.*, 2015 WL 419687, at *11 (D. Haw. Jan. 30, 2015) (denying defendant's motion for summary judgment as to bad faith breach of contract, "[e]ven if [the promise] was not expressly incorporated into the [contract]").

These decisions are consistent with case law from other jurisdictions as well.  *See, e.g.*, *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) ("A defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not violate an express

term of a contract.") (citations and internal editorial marks omitted); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395*, 38 P.3d 12, 29 (Ariz. 2002) ("[B]ecause a party may be injured when the other party to a contract manipulates bargaining power to its own advantage, a party may nevertheless breach its duty of good faith without actually breaching an express covenant in the contract.") (citations omitted).

Nevertheless, even if the court follows these decisions allowing for possible liability for a bad faith breach of contract without a corresponding violation of an express term of the contract, it does not mean that a separate bad faith breach-of-contract claim could proceed if the *same facts* form the basis of another express breach-of-contract claim.  Rather, as cases from other jurisdictions have reasoned, "[i]n order to maintain both claims, plaintiff must show that each is founded on different allegations."  *Georgia Power Co. v. United States*, 137 Fed. Cl. 74, 78 (2018) (applying New York law (citing *CFS Int'l Cap. Corp. v. United States*, 118 Fed. Cl. 694, 701 (2014))).[9]  "In that connection, 'when a complaint

_____

[9] In turn, *CFS International Capital* reasoned:

> Breach of the duty of good faith and fair dealing is a theory of breach of the underlying contract, not a separate cause of action. In order to avoid redundant claims, a plaintiff may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim.

(continued . . .)

26

alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.'"  *CFS Int'l Cap. Corp.*, 118 Fed. Cl. at 701 (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)); *see also, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 611 (9th Cir. 2020) (applying California law and explaining that "Plaintiffs also alleged that Facebook's tracking practices violated the implied covenant of good faith and fair dealing.  However, as pleaded, the allegations did not go beyond the breach of contract theories asserted by Plaintiffs and were thus properly dismissed." (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 272 Cal. Rptr. 387, 400 (Cal. App. 1990) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.")); *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 439 (3d Cir. 1993) (applying Pennsylvania law and holding "[Plaintiff] cannot assert a claim for breach of implied covenants that is

---

(. . . continued)

118 Fed. Cl. at 701 (citations and internal quotation marks omitted).

based on exactly the same acts which are said to be in breach of express covenants.").

These well-established legal principles are consistent with Hawaii law as articulated in decisions that recognize possible liability for an independent bad faith breach of contract. *See Marisco*, 2020 WL 3492572, at *7; *Amcon*, 488 F. Supp. 2d at 1080. The court will therefore apply the principles here. *See, e.g.*, *Apana v. TIG Ins. Co.*, 504 F. Supp. 2d 998, 1003 (D. Haw. 2007) ("In the absence of controlling state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case. In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions.") (citations and internal quotation marks omitted).

Here, even assuming the FAC sufficiently *alleges* different facts to formulate an independent bad faith claim, a plaintiff at a summary judgment stage must have sufficient *evidence* of bad faith that is distinct from other express breach-of-contract claims. And MNEP has no evidence of bad faith separate from its other breach-of-contract counts. In its motion, MECO points out that MNEP principals Mike Luo and Charles Magolske have admitted in deposition testimony they only have "assumptions" or "speculation" (but "no proof") that MECO was attempting "to scuttle" the PPA in bad faith. *See* ECF No. 39-41 at PageID # 531;

28

ECF No. 39-42 at PageID # 535.  In response, MNEP has produced no evidence (and at the July 6, 2021 hearing was unable to point to any evidence) of bad faith that would support an independent claim.  For example, to the extent that a September 20, 2019 email amongst MECO personnel opining that "[w]ithholding [GCOD] is probably a bigger hammer," ECF No. 46-42 at PageID # 750, might tend to indicate an improper motive, that evidence would (at best) be relevant towards the breach of an express contractual provision asserted in Counts One or Three.  At this summary judgment stage, Count Four duplicates the FAC's other counts for breaches of express contractual provisions.  Accordingly, MECO's motion is GRANTED as to Count Four.

///

///

///

///

///

///

///

///

///

29

## IV.  **CONCLUSION**

Defendant Maui Electric Company's Motion for Summary Judgment

is GRANTED in part and DENIED in part.  It is GRANTED as to Count Four, but

DENIED as to Counts One, Two, and Three.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 28, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Molokai New Energy Partners, LLC v. Maui Electric Company, Limited*, Civ. No. 20-00134
JMS-KJM, Order Granting in Part and Denying in Part Defendant Maui Electric Company,
Limited's Motion for Summary Judgment, ECF No. 38